Lastor v. City of Hearne 






NO. 10-90-032-CV

IN THE
COURT OF APPEALS
FOR THE
TENTH DISTRICT OF TEXAS
AT WACO

* * * * * * * * * * * * *

Â Â Â Â Â Â Â Â Â Â DOROTHY JO LASTOR,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellant
Â Â Â Â Â Â Â Â Â Â v.

Â Â Â Â Â Â Â Â Â Â CITY OF HEARNE, ET AL,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellees

* * * * * * * * * * * * *

 From 82nd Judicial District Court
Robertson County, Texas
Trial Court # 88-12-13, 572-CV

* * * * * * * * * * * * *

O P I N I O N

* * * * * * *
Â Â Â Â Â Â Â Â Â Â The so-called "Texas Whistle Blower Act" prohibits a local government from terminating
an employee for reporting "a violation of law to an appropriate law enforcement authority if the
employee report is made in good faith." Tex. Rev. Civ. Stat. Ann. art. 6252-16a(2) (Vernon
Supp. 1991) (emphasis added). The question is whether a city violates the Act by terminating an
employee for reporting an incident which is not a violation of law but which the employee in good
faith believes to be a violation of law. We hold that the legislature intended to protect an
employee from termination if the report was based on a good-faith belief that the incident was a
violation of law. 
Â Â Â Â Â Â Â Â Â Â A jury found that the City of Hearne maliciously terminated Dorothy Lastor as its city
manager for reporting "a violation of law" in "good faith," and awarded her actual damages,
punitive damages, and attorney's fees. Notwithstanding the verdict, the court entered a take-nothing judgment in the City's favor after concluding that Lastor was not protected by the Act
because the reported incident was not, in fact, a violation of law. The judgment will be reversed
and a judgment rendered in Lastor's favor. 
Â Â Â Â Â Â Â Â Â Â Ordinarily, an unambiguous statute must be construed and enforced as written. Morrison
v. Chan, 699 S.W.2d 205, 208 (Tex. 1985). The City argues for a literal interpretation of the
explicit requirement that the reported incident be, in fact, a violation of law. See Tex. Rev. Civ.
Stat. Ann. art. 6252-16a(2) (Vernon Supp. 1991). Under the City's view, Lastor was not
protected by the Act because the evidence conclusively established that the incident she reported
in good faith was not a violation of law. 
Â Â Â Â Â Â Â Â Â Â Departing from the strict letter of a statutory provision is necessary, however, when its
literal enforcement would thwart the legislative purpose reflected by the statute as a whole. 
Crimmins v. Lowry, 691 S.W. 582, 584 (Tex. 1985). Unrestrained by the literal wording of its
provisions, the Act as a whole clearly evidences an all-encompassing legislative intent to
encourage government employees to "blow the whistle" on governmental wrongdoing by
protecting from retaliation those who act in good faith. That the legislature would, on one hand,
encourage employees to make good-faith reports of wrongdoing and, at the same time, jeopardize
their livelihood if they happen to be wrong is incomprehensible. What could be more destructive
of the legislature's purposes than to require that the employee be right on the pain of losing his
job? Conscientious government employees could find scant encouragement in such an
interpretation of legislative intent. An interpretation more in harmony with legislative purposes
is to extend the Act's protection to employees who in good faith believe they are reporting a
violation of law, regardless of whether their belief is correct. 
Â Â Â Â Â Â Â Â Â Â Our interpretation of legislative intent is buttressed by the rule that requires a statute to be
interpreted, if possible, to give effect to its every word and phrase. See Perkins v. State, 367
S.W.2d 140, 146 (Tex. 1963). The "good faith" requirement would be superfluous and
meaningless under the City's literal interpretation of "violation of law." Logically, if an actual
violation of law is reported, then even an admittedly venal intent in reporting it would not forfeit
the Act's protection. The good-faith requirement can be given effect only if it protects the
employee from retribution for reporting an incident that turns out not to be a violation of law. 
Thus, the legislature would not have included the good-faith requirement if it had intended the
violation-of-law requirement to be literally interpreted.
Â Â Â Â Â Â Â Â Â Â Consequently, "violation of law" will not be given a literal interpretation. Thus, the court
erred when it concluded as a matter of law that Lastor was not protected by the Act because the
incident reported was not an actual violation of law. She was entitled to a judgment based on the
finding that she reported a violation of law in good faith. The first two points are sustained. 
Points three through five are not reached because under our interpretation we need not decide
whether the incident reported was an actual violation of law. Finally, points six and seven are
sustained because the court erred when it disregarded findings supported by the evidence which
entitled Lastor to a judgment. See Trenholm v. Ratcliff, 646 S.W.2d 927, 931 (Tex. 1983).
Â Â Â Â Â Â Â Â Â Â The take-nothing judgment in favor of the City is reversed and a judgment rendered against
the City in favor of Lastor for $178,772 actual damages, $25,000 punitive damages, court costs,
interest when and at the rate permitted by law, and the following attorney's fees: $50,000 through
the conclusion of the trial; an additional $15,000 through final action on a motion for a rehearing
of this opinion, if denied; an additional $10,000 if the City applies for a writ of error to the Texas
Supreme Court; and an additional $10,000 if a writ of error is granted. 
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â BOB L. THOMAS
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Chief Justice
Before Chief Justice Thomas, 
Â Â Â Â Â Â Â Â Â Â Chief Justice McDonald (Retired) 
Â Â Â Â Â Â Â Â Â Â and Justice James (Retired)
Reversed and rendered
Opinion delivered and filed March 28, 1991
Publish 



he testimony was not
qualified in any manner as to his character of being a sweet, good person, a
person who this witness could not believe for even a minute that he would
hurtÂ the baby.

Â Â Â Â Â Â Â Â Â  But the best way to understand what
went on at trial and why there was no error is to review the entire record of
this witnessÂ testimony.

HAZEL EVANS,

Having been first duly sworn, testified as
follows:

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE COURT:Â  Have a
seat, maÂam.

Â 

DIRECT EXAMINATION

Â 

BY MR. HUNT:

Â 

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Ms. Evans, IÂm going to ask
you to state your name please, for us?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Hazel Marie Evans.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  Ms. Evans, IÂm going to
ask you to do something thatÂs a little bit difficult for folks, and that is,
IÂm sitting over here but itÂs these 12 good folks here that have to hear what
youÂve got to say.Â  So what IÂd ask you to do is talk to them.Â  You can listen
to me but talk to them.Â  Would you do that for me?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes, sir.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  Tell us a little bit
about yourself.Â  Tell us where you live and maybe where you work.

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Well, my name is Hazel Evans.Â 
IÂm a, uh Â I started doing my CNA classes at Willing Springs Nursing Home, and
I live at 920 Cleveland in east of south Waco.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  You said ÂCNA classes,Â whatÂs
that?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Certified nurseÂs aid.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  All right.Â  Great.Â 
Could you tell us how you know Rickey Harrison?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Well, I know Rickey through my
son, Dedrick Evans.Â  They was good friends.Â  He was a sweet person.Â  HeÂs [sic]
was a good person.Â  He used to stay the nights at my house.Â  He done watched my
kids and I didnÂt have a problem with him.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Rickey stayed nights at your
house?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  And heÂd watch your
kids?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Uh-huh.Â  HeÂs watched my kids
before, played with them, everything.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  And how old were your
kids when Rickey was doing that?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Ooh, my babies was, like,
seven and eight.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  Rickey ever beat up on
your little babies?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  No, I never had that problem.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  Did you ever see Rickey
as he interacted with his own baby, Baby Rickey?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Well, I have seen him with his
son.Â  He done brought him to my house, let me see him.Â  He done took him to my
momÂs, let him [sic] see him, and it wasnÂt a problem.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Did he act like he liked the
kid?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes, he loved his baby.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Did he ever Â did he ever hurt
him?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  No, he had not.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Do you believe for even a
minute that he would hurt him?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  No.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  Do you know Jalisa,
Jalisa who is the aunt of Baby Rickey?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Yes, I do.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  Can you describe for
the members of the jury how you know Jalisa?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  I used to live right next door
to them at 1104 Calumet.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  And what did you see
Jalisa do?Â  Was she a little peaceful little girl who played with dollies or
something?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  No, sir.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Describe for the members of
the jury what you saw Jalisa do.

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Well, it was numerous times
her and my daughter got into it.Â  Her and my daughter had a fight.Â  She chased
my baby with a butcher knife.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Who chased your baby with a
butcher knife?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Jalisa.Â  She chased my
daughter, Shaquera with a butcher knife and Â and plenty of times they done
fought.Â  She was Â you know, she was a child but she also was started stuff in
the neighborhood.Â  Always fighting.Â  Her and my daughter stayed into it.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  How old was your daughter when
that happened?

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. PARKER:Â  Judge,
weÂre going to object at this time.Â  All of this stuff is irrelevant.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE COURT:Â  And I
sustain the objection.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Instruct the jury
theyÂll disregard the last statement of the witness for any purpose.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  (BY MR. HUNT)Â Â Â Â  How often
did you observe Jalisa?Â  How Â how Â how often did you see her and know her?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Well, I stayed over there at
Stella Maxi for a year and a half.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  And Jalisa would have
been how old during that time period?

Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â  Huh.Â  I do not know.Â  But I
know my daughter Â my daughter is 13 now, so my baby was, like, 10.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  Okay.Â  So how about Â about
how long ago was that that weÂre talking about?Â  It was about three years ago,
going on three years.

Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â  All right.Â  Okay.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. HUNT:Â  WeÂll
pass the witness, Your Honor.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. PARKER:Â  Can we
approach the bench, Your Honor.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE COURT:Â  All
right.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  (whereupon, the
Court, counsel and defendant were present in chambers)

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE COURT:Â  All
right.Â  Now, weÂre on the record outside the jury.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. PARKER:Â  Judge,
before we ask the questions in front of the jury, we wanted to inform the Court
and the defense that we believe that the defense has now opened the door to,
um, questioning this witness concerning, um, her statement Â her statements,
the defendant was a sweet and good person.Â  And we would like Â we believe that
sheÂs testifying as a character witness for him, and we would therefore like to
ask her if, uh, if she was aware that he had been arrested and put on probation
for an assault back in 2001.Â  Uh, if she was aware that he had been arrested
and placed on probation for assault on a public servant in 2002.Â  If she was
aware that he had been, uh, given a citation for disrupting class in March of
2002.Â  Uh, just ask her if Â if any of that information would change her
opinion as to whether or not he was, in fact, a sweet and a good person.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. HUNT:Â  If I
could respond to that, Your Honor.Â  I believe that she said around her children
he was a sweet and good person.Â  She did not say his character in the Â in the
community is that of a sweet and loving person.Â  She described his character
around her children.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE COURT:Â  Okay.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MS. WALKER:Â  I
didnÂt hear her qualify it, but I just heard her say heÂs a sweet and good
person but it wasnÂt pursuant to any question, I would admit that.

Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE COURT:Â  Let Â
letÂs go back and look at the testimony.Â  How hard would that be to find?

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE REPORTER:Â 
Okay.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE COURT:Â  In
other words, do we need to recess them until in the morning?

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE REPORTER:Â  Um,
I can quick try and do a search.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Okay.

ANSWER:Â  ÂWell, I know Rickey through my son,
Dedrick Evans.Â  They was good friends.Â  He was a sweet person.Â  HeÂs [sic] was
a good person.Â  He used to stay the nights at my house.Â  He done watched my
kids and I didnÂt have a problem with him.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. PARKER:Â  Judge,
itÂs our contention that there was no qualification on the answer.Â  She says,
heÂs a sweet person, good person.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. HUNT:Â  The
question I think had to do with the children, Your Honor.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE COURT:Â 
Overrule the objection.Â  LetÂs go ahead.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  (whereupon, the
following proceedings took place in the courtroom.Â  The Court, counsel, and
defendant and jury present.)

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE COURT:Â  Go
ahead.

Â 

CROSS-EXAMINATION

Â 

BY MR. PARKER:

Â 

Q.Â Â Â Â Â  Ms. Evans, you had earlier Â earlier
stated during your testimony for Mr. Hunt, you said that Â that, uh, Rickey
Lynn Harrison, Sr., is that the guy thatÂs seated to the right of Mr. Hunt?

A.Â Â Â Â Â  Uh-huh.Â  Yes, sir.

Q.Â Â Â Â Â  That he was a sweet and good person; is
that correct?

A.Â Â Â Â Â  Yes, he was.

Q.Â Â Â Â Â  Okay.Â  And Ms. Evans, were you aware
that in July of 2001, that Rickey Lynn Harrison was arrested for assault and
subsequently went to juvenile for that?

A.Â Â Â Â Â  Yes, I was aware.

Q.Â Â Â Â Â  Okay.Â  Ms. Evans, were you aware that in
Â on June the 10th of 2002, that he was adjudicated for assault on a
public servant in a Â 

A.Â Â Â Â Â  No.

Q.Â Â Â Â Â  -- in a case here in McLennan County for an incident at Waco High School?

A.Â Â Â Â Â  No.

Q.Â Â Â Â Â  Were you aware that he had been given
citations, uh, for disrupting class back in 2002?

A.Â Â Â Â Â  No.

Q.Â Â Â Â Â  Knowing all this information, Ms. Evans,
do you still think heÂs a sweet and good person?

A.Â Â Â Â Â  Yes, I do.Â  ItÂs been because heÂs been
at my house plenty of times.Â  He have never done anything that would
disrespected me, never disrespected my house nor my kids.

Q.Â Â Â Â Â  Okay.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. PARKER:Â  Pass the witness,
Your Honor.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  MR. HUNT:Â  We have no other
questions of this witness.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE COURT:Â  You may step
down.Â  YouÂre excused, maÂam.

Â 

RR IV, pg. 194-201.

Â Â Â Â Â Â Â Â Â  When the purpose of calling a witness,
in context, is to provide that witnessÂs opinion as to the character of the
defendant to commit the act Â Do you believe for even a minute that he would
hurt him? Â the witness must be subject to cross-examination on the basis for
the opinion.Â  The discerning reader will note that there were two objectives
for using Evans as the final defense witness; to build up Harrison and to point
the finger at someone else, both to be accomplished by EvansÂs opinion of the
persons to commit the act.

Â Â Â Â Â Â Â Â Â  The facts of this case are unlike
other cases in which a vague reference about a person by a witness testifying
on some other topic was attempted to be used to open the door to character
evidence.Â  The trial court was very careful to make sure the testimony was not
qualified as to EvansÂs opinion of HarrisonÂs character as it related to interaction
with her children.Â  The State approached the bench when the witness was
passed.Â  The trial was suspended while counsel and the court reviewed the
recorded testimony in chambers.Â  Defense counsel argued that Evans described HarrisonÂs character around her children.Â  When the testimony was read back in chambers, it
was clear that the testimony was not limited in any manner.Â  And it must also
be remembered that counsel had asked a subsequent question which called for
EvansÂs opinion of HarrisonÂs character:Â  ÂDo you believe for even one minute
that he [Harrison] would hurt him [the baby]?ÂÂ  RR IV, pg. 196, lines 5-6.

Â Â Â Â Â Â Â Â Â  The only case relied upon by the
defense, Ward v. State, 591 S.W.2d 810 (Tex. Crim. App. 1978), and all
the cases relied upon by the majority, Rutledge v. State, 749 S.W.2d 50
(Tex. Crim. App. 1988); Stephens v. State, 660 S.W.2d 85 (Tex. Crim.
App. 1983); Nixon v. State, 653 S.W.2d 443 (Tex. Crim. App. 1983); Smith
v. State, 763 S.W.2d 836 (Tex. App.ÂDallas 1988, pet. refÂd); Powell v.
State, 663 S.W.2d 465 (Tex. App.ÂHouston [1st Dist.] 1983, no pet.),
hearken back to a time when there was a distinction between the admissibility
of reputation-of-character evidence and opinion-of-character evidence.Â  Thus,
for example, in Rutledge, testing the basis of the witnessÂs opinion
testimony was not an issue because the testimony had not put the defendantÂs reputation
into dispute.Â  Thus, these cases do not stand for the proposition for which
they are cited because the issue in these cases was whether the reputation
regarding the defendantÂs character, as distinguished from the witnessÂs opinion
of the defendantÂs character, was put into issue.Â  In this case, the State
argued that the testimony was opinion testimony regarding HarrisonÂs character.Â  The trial court agreed.Â  I agree with the trial court.Â  Even if I
did not agree with the trial court, I could not find that his decision was
outside the bounds of reasonable disagreement.Â  

Â Â Â Â Â Â Â Â Â  Because EvansÂs testimony put her
opinion of HarrisonÂs character in evidence, the State was authorized to probe
the reliability of that opinion, so that the jury could give it the proper
weight, by inquiry into EvansÂs knowledge of specific instances of conduct.Â  Tex. R. Evid. 405(a).Â  Defense counsel
did not object to the non-responsiveness of the answer to his question, did not
request an opportunity to clarify EvansÂs testimony, did not request a limiting
instruction on the use of the StateÂs evidence, and did not object to its
unlimited use in argument by the State.Â  Finding no error in what the trial
court did, I would affirm the judgment.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  TOM
GRAY

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Chief
Justice

Â 

Dissenting
opinion delivered and filed October 19, 2005

Â 









[1]
Because the majority is withdrawing their
prior opinion and judgment, my dissenting opinion thereto, dated July 20, 2005,
is withdrawn.Â  While I would like to spend more time fine tuning this
dissenting opinion, the 30 day requirement of Rule 50 must be complied with.Â  Tex. R. App. P. 50.